Chicago Regional Council v. Schal Bovis. Mr. Duffy? Good morning, Your Honor. My name is Michael Duffy. I am the counsel for Defendant Appellant Schal Bovis. Just by way of brief background, this case involves a payroll audit conducted under a collective bargaining agreement between my client and Chicago Council of Carpenters, and specifically concerning the application of Article III, Section 3.5 of that agreement, having to do with subcontracting of carpenter work to an alleged non-signatory contractor. During the scope of the audit, initially, several dozen subcontractor claims were raised. By the time the party's lawsuit was filed, eight of those remained. Four of those were subsequently dismissed fairly quickly. So we wound up, essentially, with four claims standing before the court that went to cross motions for summary judgment. The district court entered summary judgment in favor of the plaintiff funds and against us. Subsequently, the damage issues were submitted by written submissions to the district court, and a final order was entered, which is why we're here. Our appeal raises several issues. Specifically, whether the district court erred in granting summary judgment regarding the Canak Kitchens and Edward Don claims. Number two, in the alternative, whether the district court erred in assessing liability for certain of the work that the Edward Don subcontractor had done, which was clearly not carpenter jurisdictional work under the facts of the case. And then finally, whether the district court may have abused its discretion in awarding attorneys fees for certain pre-lawsuit work done on the claims that were never brought or that were subsequently dismissed fairly quickly into the litigation. Our position is that the district court erred in granting summary judgment on the issues of liability for those two claims. And we'd like to address, I think, what we believe is probably the most important of those issues, and that's the Canak Kitchens claim. Essentially, what the carpenter's contract requires is you have to contract with another entity, if you're a general contractor. You have to subcontract carpenter jurisdictional work to a signatory firm. Pretty simple. And if you don't do that, you have to keep track of the hours that that subcontractor works and pay fringe benefits to the plaintiff funds on behalf of the work that's done in that particular job, or get them to sign a collective bargaining agreement. Either way. So if a non-union contractor, subcontractor, does the work, they still have to pay the fringe benefit obligation to the union. That is correct. It flows from the obligation to subcontract that work to a signatory contractor in the first place. If you don't do that, then you basically pay the, it's not a penalty, but you essentially make the funds whole for the amount of pension, welfare, apprenticeship, and other contributions that would have been made by that signatory employer to the funds, but for the fact you subcontracted to the wrong person. In that particular case, then, the non-union workers, I don't know who pays it, whether it's the workers or the contract itself, but that only benefits the fund, and obviously not those workers. That is correct. And if the union does that work, then obviously that then they're out of the contract. Then the hours are credited for the employee. So whether it's union work or non-union work, the fund's still going to get paid. Correct. And I guess your position is with this single employer that that went over to QualiFit, and they were all union, and they did pay the fund. Exactly, for two reasons. And the main reason on the single employer, which I'm glad you mentioned, is if we contracted with Canak, which was the supplier, to purchase and install these cabinets for these three high-rise projects, Canak in turn subcontracted its work to its sister company, QualiFit. Funds are arguing, well, Canak's not signatory, so you violated the agreement no matter what Canak did. Well, that's a separate issue, but our position is we did contract with a signatory contractor because of the relationship between these two companies. As a matter of law, they're a single employer. And under the single employer doctrine, two or more entities can be bound to a collective bargaining agreement because of various factors. Common ownership, common management, day-to-day interrelationship of operations, and common control of labor relations. Those are the four criteria that the Supreme Court and this court in the Lippert-Tile case a couple of years ago determined would be the yardstick in determining whether you're a single employer. The facts of this case and the facts of Lippert are virtually identical. There is no question, based on the facts in this record, common ownership. They do business in the same office. They're run by the same manager who basically supervises the labor relations of the carpenter employees, bids work for them, doesn't have a written subcontract, and the parent company pays the fringe benefits directly to the funds. Suppose the district court were to declare that Kanuck and Crawford were really a single employer. Yes, Your Honor. Could this conclusion end up being raised judicata and used against Kanuck and Crawford in another suit where someone sought to make Kanuck liable for Crawford's obligations? And would that be fair? Short answer is no, because Kanuck and Crawford, of course, A, they're out of business. B, but that's not the important criteria. The important criteria is that, in terms of race judicata, they're not party to this lawsuit. And as I recall from law school, the doctrine of race judicata, you have to be a party litigant to the case. Our argument is very simple. If they are a single employer, and nobody is arguing here in this case that Qualifit, the union sub, the union arm of Kanuck Qualifit, paid the fringes. We put it in the record. Fringe benefit reports for the entire period of the audit showing hundreds of thousands of dollars of payments to the funds on behalf of Qualifit. Qualifit's never been argued, as far as we know, in the facts of this case, to have been a delinquent union signatory employer. Our position is very simple. If we're obligated to subcontract to a union signatory firm, we believe we did that as a matter of law, because these two companies are joined not just at the hip, they're joined completely. Well, of course, the fund has argued that it would be odd to make a factual determination about whether those two were a single employer, without any evidence presented by the companies themselves. Well, actually, we did present evidence by the companies. The former manager, Nate Science, who was actually the person who ran this company, was deposed, and he testified at length as to what the relationship between these two companies were. If he doesn't know the answer to that question, nobody does. He ran the company, and he testified without contradiction as to what the facts were. I have just, I guess, a bottom line question. Didn't the funds get paid for those that were for the fringe benefit? In our view, yes. Well, what's your view versus their view? The problem is that, and we raised this issue at the district court, which we did not raise here for this court, we believe that in any event, the contributions were paid. They're in the record. The contribution forms are in the record. The problem is the contribution forms, and if you look at the record, you'll see this, none of these forms ever say what you have to do to say where this particular employee worked. You have a list of employees on the form, how many hours you worked during the month, the contribution rates, the pension, the welfare, the apprenticeship, the labor management cooperation fund, and as bottom line, you sign it, send a check, and that's what happens. You never know in that particular month if Mike Duffy or John Jones or Joe Smith or anybody else worked at project A, B, C, or D. You just know the total gross of the hours for the month. So we could not prove that all of these people on these report forms worked during that period of time individually for Shulbovis on these projects. Now, we identified some of them in the record that we said, yes, they were clearly there. But could we prove all of them? No, but no employer can. These funds do not require you to do that.  and the amount of money you're supposed to pay. Well, that gross total in the amount to paid, whether you got, if it had to be non-union people, they got to pay it anyway. Correct. And if it's union people, they pay it automatically. Yes. And where I have a problem is I wouldn't want to union the fund to get paid twice. Well, and we believe that that's exactly what will happen here, because clearly funds were paid. During the, Mr. Science testified, the Shulbovis project, the three projects in question, there were three high rises on Michigan Avenue. They were the largest group of work that they did during the period of the audit, 2006, 2008. It would beggar credulity to say that none of those hours related to the Shulbovis projects. And nobody testified to the contrary. It's just that we could not identify the list of 10 or 12 or 15 people for that month. Did we know every single one of them worked all of those hours on this project or some other project during that month? We just don't know. And the company's defunct. And Mr. Science couldn't tell us from his recollection, nor could he have been expected to. Nobody would know that. But do we believe there's double recovery here? Yes, we do. Well, somebody worked there. Somebody did the work. And this is, why don't we know that, let's just take it took 10 people to do this for some period of time. And they did. And then the funds are paid for that. That's where I have a problem. If the funds were paid, that should be the end of it. But if they say they weren't, or there's no proof of it or something, then? Our argument to basically avoid dealing with that factual issue, which there is no resolution of, our obligation is to subcontract to a union-bonded company that's signatory to the collective bargaining agreement. Once we do that, whether or not that company pays its fringes or not isn't our problem. It's their problem. Because they're signatory. And the union and the funds can look at them. And our issue dictates the result of most of the rest of the case. We believe it certainly does with the Canik claim. Yes, we do. That once we have contracted, if Canik is a single employer and we contracted with them, they're bound to the collective bargaining agreement. We did what we were required to do under 3.5. Whether QualiFit paid all of its fringes or not, we believe they did. Mr. Science testified to that. Says he believed he paid all of the funds, but he can't testify specifically to each week, each month of those two-year periods. He just can't do it. And no one is around to do it because the company no longer exists. And the records are in somewhere, house somewhere, God knows where. I'm going to go somewhere different, because I want to talk about, for a minute, if we could, the standard of review. Yes, Your Honor. Of course, there's such disagreement on the standard of review. Well, in terms of the liability issues, Judge, for the summary judgment, this is reviewed de novo, as we understand it, as far as the liability is concerned. These are legal issues. The facts, as we understand them, as far as we're concerned, aren't really in dispute. We don't believe that they are. The issue is a legal issue. Is Canik Kitchens a single employer, or isn't it? And that's a de novo issue for this court to decide on its own. The district court. But aren't the subsidiary facts disputed here? I don't believe so, Judge. The facts as to the structure of the company. You know, maybe. I'm sure Mr. McJesse might take issue with that. I think he's wrong. You'll remember my question if I can't. I do not believe, taken as a whole, the facts are in dispute with respect to the status of these two companies, or the fact that what happened here. I mean, we believe that to be the case. You could quibble with whether or not you credit the weight of certain of these facts, but the funds didn't testify in contradiction to anything that Mr. Science testified to. He was the only witness that talked about the structure of these companies, and his testimony is unrebutted. And he's in the position to know. He was there. He ran the companies. On a related issue, apart from the single employer issue, we have what we call a contract interpretation and fiduciary liability type issue, which has to do with the fact that during the course of the audit, in this particular case, assuming, which we don't, that Kanek and Qualifit were not single employers, two other claims involving other subcontractors who did subcontract work to union companies, even though they themselves were not unionized, were taken off the audit for no explanation. And we believe the inference as to why they were taken off, based on the arguments raised by my client during the course of the audit, was they were taken off because the union and the funds were satisfied the work was done by a union contractor, which in fact was the case. Our argument is, if you're going to interpret and apply the collective bargaining agreement in a legitimate, unbiased, non-arbitrary fashion, if you take those people off the audit, why can't you take Qualifit and Kanek off the audit? Same facts, same fact situation. They're either right here or they're wrong there, but they can't be right and wrong at the same time. The similar issue comes up with respect to the Edward Don claim, a little different portion of the collective bargaining agreement, which has to do with whether or not the installation of sheet metal work, in this case, was or wasn't carpenter union work. Here again, during the course of the audit, and once the lawsuit was filed, a claim regarding a company called Midwest Commercial Kitchens, which was signatory to the sheet metal workers' agreement, not the carpenters', was involved in a jurisdictional dispute proceeding where the jurisdictional dispute arbitrator said, this is sheet metal work. It's not carpenters' work. And they denied the claim. And then the auditors and the plaintiffs removed that claim from the lawsuit. Yet the Edward Don claim involves exactly the same set of facts. The installation of sheet metal kitchen equipment by the sheet metal workers, but that's union work, even though the Midwest Commercial Kitchens is not, and it was taken off the audit. Here again, we believe you have to be consistent in interpreting and applying the collective bargaining agreement and the trust agreements. Again, if Commercial Kitchens should have been removed from the audit, so should the Edward Don claim as well. Well, with the sheet metal workers' union, is that the union? Yes, that's correct. Were they paid? Far as we know, yes. So that fund? That fund got the money. Is that sort of a reciprocal, where if one union gets it, the other one doesn't? Under Article 1.1 of the collective bargaining agreement, there's a discussion at length of the jurisdiction of the carpenters for all sorts of different things that they claim. The final sentence of that paragraph says that the union will not lay claim to work which is considered to be within the jurisdiction of another union. That's not a direct quote, but that's the sense of it. And Mr. Libby, in his deposition, who's the fund collection coordinator, testified that on occasion, frequently, the union and the funds discuss whether or not they can make claims as to the work done by perhaps another union's people, because that's work that we shouldn't claim under Section 1.1. And indeed, a lot of the claims in this audit, one particular involving a company called Shower Works, was the installation of mirrors and shower doors in the condo. The carpenters' union claimed that work, but they withdrew that from the audit. Why? Because that work was performed by the Glaciers, another union. Another union. Yes. And they paid their people under their contract and their funds. How does anything get built? In spite of all of this, Judge. One thing I think it's important to note here, these cases sometimes arise in the context of union versus non-union. This was 100% union construction. And you can't do that in downtown Chicago. You can't build. You can, I suppose, if you'd like to go to war. But you build union in the city of Chicago. And we did. The question here is, which one is entitled to claim this work as far as Edward Don is concerned? And number two for Canik, did we sub-union? And we think the answer to that is, yes, we did. Yes, we did, because of the single employer issue and because the work, in fact, was done by the union contractor in question, qualified, bonded, paid the fringes. I'm stumbling into my rebuttal time. If the court has any other questions, if not, I'll save the rest of my time. Thank you, Mr. Duffy. Thank you, Your Honor. Mr. McJesse? Good morning, Your Honor. Kevin McJesse on behalf of the Chicago Regional Council of Carpenters. I'd like to start out by addressing the Canik Kitchens issue, because it clearly is the big, it's the gorilla in the room here for this case. And in particular, the question is going to whether the trust funds are receiving a double recovery here. I think it's helpful to start at the beginning of the argument here, which is that Shaw Bovis breached the collective bargaining agreement by entering into a subcontract with Canik Kitchens for the purchase and installation of kitchen equipment. There's no dispute about that. Mr. Morley, the representative from Shaw Bovis, he didn't dispute that. He acknowledged that they entered into a contract with a non-union contractor to perform carpentry work. That is undisputed. Therefore, that's a breach of section 3.2 of the collective bargaining agreement. The collective bargaining agreement, as Mr. Duffy correctly points out, clearly states that if a contractor breaches article 3.2 of the collective bargaining agreement, that the employer is obligated to maintain daily time records of the employees who are on the job site and the hours they work, or alternatively, to have the non-union subcontractor become a union subcontractor. In this case, that didn't happen. There is absolutely no record whatsoever. It's undisputed. No record whatsoever of who worked on this job site, the days that they worked on the job site, or the hours that they worked on the job site. The contribution reports that Mr. Duffy is referring to, which were tendered by QualiFit Kitchens, a company, by the way, who wasn't paid for any work in this case, and a company who has no subcontract to perform any work in this case. QualiFit did submit fringe benefit contributions to the trust funds for the applicable period. Those are monthly fringe benefit contributions. They're in the record, and they show that QualiFit Kitchens reports so many workers to the trust funds on a given month for work that QualiFit Kitchens is doing. They don't say where the work was done. They don't provide an hourly breakdown. They don't even provide who QualiFit Kitchens is working for during that particular month. So, see, so QualiFit appears nowhere in the contract. Is that the problem? QualiFit is not part of the contract between Shaw Bovis and Cannock Kitchens. That's correct. Well, I mean, as far as the whole picture, I mean, there are probably lots of things. I mean, QualiFit isn't just, were they identified in another part of the construction of this big building, or not? They paid into the fund, that's for sure. They did pay into the funds, and they are a union contractor. Is there anywhere else that they would have had reason to pay into the fund besides this project? Oh, sure, Your Honor. Mr. Saenz testified that QualiFit Kitchens was working on several projects in downtown Chicago. No, no, I mean this project, the one that's in dispute. I'm sorry, I don't follow your question, Your Honor. Isn't this just one project in one place? No, there's actually three projects that are at issue. Shaw Bovis hired Cannock Kitchens to install cabinets in three different locations during that same period of time, and Shaw Bovis's position is, well, yes, we hired Cannock. Yes, they were non-union. No, we didn't keep records, but they are really the same company as QualiFit, and leaving that argument aside for a moment, QualiFit is a separate company doing separate work at various locations around the city. Nate Saenz testified that QualiFit Kitchen, Nate Saenz, by the way, works for Cannock Kitchens. He doesn't work for QualiFit, but he testified that QualiFit, I'm sorry, Cannock did have workers from QualiFit on the job that Cannock had been hired to do. He also testified, however, that QualiFit was working on various other projects around the city of Chicago at the time, and no, he could not say, for example, who worked on which project, how many hours they worked, whether the hours for any given particular project were reported to the trust funds. For example, it would not be beyond pale because the testimony by Shaw Bovis was that they were demanding so much labor to get their jobs done because these were such big jobs, they were trying to find workers to staff these jobs and get them done. At the same time, QualiFit is working other projects in Chicago. Mr. Saenz testified to that. If contributions weren't paid to the trust funds for the hours that were worked by the workers on the Shaw Bovis project, we never know. There's no way for them, conversely, to show that yes, the hours on the Shaw Bovis projects were paid. They just can't do it. They didn't maintain the daily hourly time records that would show who was on the job and the hours that were worked. There's something I've been wondering about, and it's this. If you can tell me why it would be fair to allow a plaintiff to use the single employer doctrine to make one company liable for the obligations of the other when we're talking about Canuck and QualiFit, but not to allow those same companies to use a single employer theory as a defense against it? And don't forget my standard of review question. I haven't written it down, Your Honor. The reason it wouldn't be fair, one, no court's ever done it. It would be completely novel if this court did it. Two, it's not consistent with the nature of the doctrine. The doctrine is really designed to prevent employers from cheating ERISA fringe benefit contribution funds. So, for example, I run a company, and I'm a union employer, and I want to have non-union people do work and not pay fringes on them. I start a separate company. It's really my company, and that company hires and pays non-union workers. I'm effectively in breach of my agreement. It's not fair to allow somebody to do that in violation of ERISA, so the courts have adopted the single employer doctrine to prevent that kind of cheating, as it were. The reason that it's not at all reasonable for Shaul Bovis to be able to rely on the single employer doctrine to do that, and Judge Lindbergh sort of addressed that point in his Speck versus Moriarty decision, which we cite, that explains the basis for the single employer doctrine and why it should not be allowed to be used as a defense, but if Shaul Bovis were allowed to do that, the result would be absolutely absurd. What you would have is a potential defendant who subcontracts work to a non-union employer, Shaul Bovis did here, and then what you would have is them claiming that, no, the non-union subcontractor that we hired, it's really union. Even though those parties aren't before the court, let's say that the court could somehow decide that, in fact, they were. There's really no adversity in that case. Say the trust funds even colluded and said, sure, okay, we agree those two companies are single employer. After the fact, you have two companies out there that have been adopted to be a single employer. If the trust funds were to go and try to collect fringe benefit contributions from the company that never signed a collective bargaining agreement on the basis that a court has ruled that they're a single employer, you would have a non-signatory company that would be crying foul. You would have a situation where the original general contractor would not have paid in fringe benefit contributions because it hired a non-union contractor, and the trust funds would, if the court decided that, in fact, they weren't single employer in a subsequent lawsuit where those parties are actually before the court, the funds would have no remedy. I'm not sure I, did I explain that well enough, Your Honor, or? I have to think about that. Okay. I really do. Well, I would clarify one thing. Is this similar to withdrawal liability? It is not the same as withdrawal liability, Your Honor. They are two separate issues. All right, well, because obviously, if somebody closes a business and the successor falls down, they can go back to the original. And I think that's one of the, I thought that's where you're saying you can't go both ways with this, that maybe if I'm wrong on that. No, I'm just saying you would have potentially a judgment out there by a court that would be holding the two companies are, in fact, one, that the union and non-union company are the same company, that both are bound by a collective bargaining agreement, and that's the reason that in the present case, we're not gonna require the general to pay in fringes. And then the trust funds to go collect that money that's apparently owed would have to sue those two companies who were never party to the original action where the court found them to be single employers. Imagine if we went after Canik Kitchens and QualiFit, if they were still in business now, and the district court had held that they were a single employer, and Canik had union carpenters it had never paid in on because it doesn't, because it's non-union. The trust funds sue those two companies saying, well, Canik, you know, you're really a union company just like QualiFit because Judge Shaw held that you were a single employer. Canik would be going, huh, I didn't sign a collective bargaining agreement. How can you possibly, I wasn't party to that lawsuit. I wasn't, I was never advised that this could possibly be. It would be a shocking result for two parties that were never in front of the court, which also raises the standing issues that we addressed in our brief, standing and actually having a case or controversy before the court. There is no case or controversy as to the claim between QualiFit here and Canik. They aren't party to the litigation before the court. There's nobody to actually raise that as an issue. Mr. Chesley, just by way of interest to me at least, the initial audit sought, produced a result that the fund felt was close to $6 million. And upon review or whatever, it came up with a figure of 1.2. What interests me is since we have some question of record keeping here, right? By, that seems to be the missing gap. What is it that the audit later showed indicating the need to focus on the 1.2 people versus the 4.8 that are no longer before us? I understand they're not before us, but I just, I wanna get a little better grasp on how the audit works here. That's all, so. Well, and I think your honor's question actually addresses an issue that I think we have as sort of a difference in characterization that Mr. Duffy started out with, with the beginning and saying this started out with 39 claims or something that was reduced. That's not an accurate characterization. Yeah, I'm not being critical. So you understand, I'm not questioning the ability to revise an audit. I just am trying to get a handle on the procedures which cause some focus to remain, obviously, on the case we have before us. Sure, and it starts out with an auditor reviewing payments to various parties and not being able to identify what the purpose of those payments is. So there were 30, the auditor went in and reviewed records for payments to a lot more than 39 subcontractors and payments to employees and various other parties. But ultimately, the auditor got down to a point where there were 39 companies to whom Shaw Bovis had subcontracted work for which the auditor couldn't make a determination as to whether contributions should be owed or shouldn't be owed. That would depend on the kind of work they performed. It would depend on, I don't know, other factors, but that would certainly be one of them. And the auditor asks for records and eventually when they ask a couple of times and don't get the records, they prepare a final audit report believing that the employer isn't going to produce those records. So, and that's part of our original lawsuit is that we sued not only for any owed contributions but also to compel Shaw Bovis to produce books and records that would allow the trust funds to complete the audit because in effect, Shaw Bovis had, although over time had been producing records, eventually there were two final notices given by myself, in fact, after the auditors had thrown up their hands and returned the audit to the trust fund saying, we're done, we're not getting any more records. Two final notices from me that by that point, we got the audit down to, I think, 1.2. I could be incorrect about that, Your Honor, but that number sounds like it could be right. It wasn't until the lawsuit was filed that yet additional records were produced that showed some of the other subcontracting that was in the audit should be removed. But the trust funds and Mr. Duffy refers to those or Shaw Bovis does rather, I'm sorry, in his briefs by saying that these claims were non-suited, which I looked up and it means dismissed, although the parlance isn't used much anymore. There were no claims that were dismissed. We filed a four count complaint asking for payment of amounts due and books and records so that we could complete an audit. The trust funds prevailed on all four of those counts, all four of those claims. The fact that we had to actually file the lawsuit to get some of the books and records shows non-compliance with the requirements that they had. Mr. McJessie, I thought, and I appreciate your response to Judge Rovner in discussing Judge Lindbergh's case in Moriarty and how we don't want employers to use this as a shield, this single ploy or the doctrine. Do we have, and you gave an example, of course, of creating the shell company that you owned as non-union people. Do we have a scenario like that with Shell Ball? I mean, do we have a sense that they were about employing non-union people? And is there any analogy to the appropriate hypothetical you gave? I think the best answer to that question is, Your Honor, that whether it happened here would depend more on what was the relationship between, for example, Shaw Bovis and Edward Dunn and Reed's Fire Equipment and R.B. Hood, for example. That was one series of a chain of subcontracting. And were the alleged related companies there, R.B. Hood and Reed's, trying to circumvent the collective bargaining process that they were signatory to, or were Canik and Qualifit, if we take Shaw Bovis's argument that they are, in fact, a single employer, we'd have to get into a case where the trust funds would sue, for example, Canik, and say, you're a single employer with Qualifit, and determine whether there was some shenanigans going on there, for want of a more technical term. And I think the answer is, we just don't know, but that's not the issue that's presented in this context, where he's trying to make that argument. I do want to address, I see I'm getting close on time, I do think- Forgive me, because I do have a question about R.B. Hood. There was evidence that they paid fringe benefits. There was- And for a total of 72 hours. And the district court, it would seem, ignored that evidence. I mean, shouldn't the district court, at least for that amount, say Shaw Bovis is off the hook? Well, that's a good question, your answer, and I think I can address that question, along with the issue about the double payment that came up earlier also, because they're somewhat related. The fact of the matter is, two things. One, it was a record-keeping issue. As the district court properly recognized, and as we believe the district court should recognize with respect to the Canik payments, there was no evidence of, none, of actual hours worked by the parties, who did the work, and what work they did. And that was the problem, because Reeds and R.B. Hood were essentially sort of the same company, or at least they had the same president, and he worked for both companies. The payments only went to Reeds. There was never a payment to R.B. Hood. The court just said, look, there's a $20,400 payment here to this company that kept no records. Shaw Bovis didn't keep records. Edward Dahn didn't keep records. Reed didn't keep records, and R.B. Hood didn't keep records. It was clearly for jurisdictional work, and that's, it falls squarely within Article I of the collective bargaining agreement. And because the employer didn't make, employer, in this case, Shaw Bovis, didn't make any effort to maintain any records, and because the court can't make hide-in-her-hair of the testimony of the owner of R.B. Hood and Reeds, the court is going to apply the stipulated-to method of calculating damages and award damages accordingly. We believe the court should have taken the same approach with respect to Canik and Qualifit, because there is, I understand that Qualifit did report contributions to the trust funds, and I understand that Mr. Sines said he believed that Canik used Qualifit to perform the work, but Mr. Sines testified there are no records to show who did the work at the Shaw Bovis sites. There are no records to show the hours they worked. There's no records to show that Canik reported the fringe benefit contributions for those specific hours to the trust funds, and accordingly, under Section 3.5, Shaw Bovis is liable for having hired a non-union contractor and for the hours they worked. Mr. Pichessi, did you reserve time for rebuttal? I wasn't given that option, Your Honor, so I did not do that. Okay, all right. Thank you. Thank you. Mr. Duffy, thank you, Mr. Pichessi. Thank you, Your Honor. Couple of very minor points to follow up. Mr. McJesse mentioned Judge Lindbergh's decision in the Moriarty v. Yvette case, which Your Honor and Your Honor reversed on appeal, and the reason that you reversed it on appeal was exactly on the issue that Judge Lindbergh had commented on that Mr. McJesse cites, which is you can't use the single employer doctrine as a shield. You can only be a union or a fund and use it as a sword. This court said no, that's not true, and remanded the case to the district court for further proceedings on that very issue. In fact, I think the words this court used was you're basically bound by judicial estoppel. If you argued they're a single employer, you're stuck with the consequences of them being a single employer, and that is exactly the point that we're making here. If they're a single employer, we believe you're a single employer for all purposes. No court in this country, based on our research and Mr. McJesse didn't find any, except for Judge Lindbergh's statement, has held that, that you can only use it one direction. We believe it's a two-way street. Number two, Your Honor raised the issue of R.B. Hoods. Mr. McJesse was not quite accurate to say this was all jurisdictional work. In fact, the testimony was there was two kinds of work being performed by Reeds and R.B. Hoods. One was the installation of the stainless steel kitchen equipment, which we believe should be treated like the Midwest commercial kitchens issue. But apart from that, even if we're wrong, the remainder of the work was installation of fire protection equipment, which Mr. Libby testified in his deposition they wouldn't be claiming. But they want to be paid for it anyway, and we believe it's their burden to prove what the amount of the two amounts of work here were. And the only evidence was the testimony of Mr. Barrett, who did the work, who said, I did about 72 hours worth of the installation work. I paid fringes to the sheet metal funds. And to me, that's all I recall doing. For whatever reason, the district court didn't think that that testimony was persuasive. But there's no other testimony in the record to say what it was, in fact, that they did. You can't speculate that all of this work, which we concede, some of which is not jurisdictional, should nonetheless be paid for that reason. We just don't think you can do that. It's their burden to prove it. If they can't prove it, they lose. If the court has no other questions, thank you very much for the opportunity. Thank you, Mr. Chesley. The case is taken under advisement.